### Richmond

## County of Rockingham

## v.

## City of Harrisonburg

September 9, 1982.

Record No. 812007.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, Russell, JJ., and Harrison, Retired Justice.

68

*Robert C. Fitzgerald (George R. Aldhizer, Jr., County Attorney; Myron C. Smith; Fitzgerald and Smith, P.C.,* on briefs), for appellant.

*William R. Cogar (Norvell A. Lapsley, City Attorney; Henry T. Wickham; Carter Glass, IV; Mays, Valentine, Davenport & Moore,* on brief), for appellee.

*Amicus Curiae:* Counties of Albemarle, Augusta, Campbell and Prince George. (George R. St. John, County Attorney; James M. Bowling, IV, Deputy County Attorney, on brief), for appellant.

POFF, J., delivered the opinion of the Court.

The County of Rockingham appeals from an order annexing approximately 11.64 square miles of its area to the City of Harrisonburg. We granted the appeal for the opportunity it provides to examine the 1979 amendments to the annexation statutes. Acts 1979, c. 85 (hereinafter, the 1979 Act). We affirm the decision of the annexation court.

In May 1975, the City petitioned to annex approximately 14 square miles of the County. The action was stayed for the duration of the "moratorium" on annexation imposed by the General Assembly. Code § 15.1-1032.1(A). The moratorium was terminated effective July 1, 1980, and the annexation court referred the matter to the Commission on Local Government. Code § 15.1-1170.

That Commission's report recommended annexation with certain limitations and upon certain conditions. The final order, entered September 1, 1981, approved annexation of 11.64 square miles, effective midnight December 31, 1981. The order was suspended pending this appeal.

## I. *Background Facts*

The City, which has a population of 19,671, presently occupies 5.9 square miles. Operating under a council-manager form of government, it employs 630 employees, including 30 police officers and 12 full-time firefighters. Fire protection service is supplemented by numerous volunteers.

The City provides water to its residents and to 478 customers in the area sought for annexation. It has several large sources of water, including Rawley Springs, Silver Lake, North River, and the Shenandoah River. It provides sewerage collection service for its residents. Sewerage treatment is furnished by a regional authority in which both the City and the County are partners.

The City finances construction and maintenance of streets, curbs, gutters, storm drains, and street lighting. The City collects garbage from residences twice weekly. It owns a taxicab company and operates a small, fixed-route bus system. It operates a well-developed recreational system, consisting of approximately 250 acres of park land. The City is the seat of the County government, and many of the County's 1,143 full-time employees work in the City.

The County, with seven incorporated towns, occupies 865 square miles, 32% of which is private mountain land or national forest. Its population is approximately 56,000. The County is the leading producer of agricultural and dairy products in the state. Over 63% of its farm income is derived from poultry.

The County provides water service to several developed areas outside the City and the towns. Most of this water is purchased from the City. Fire protection is provided chiefly by volunteers with the County's financial support. The County owns no firefighting equipment but employs eight full-time firefighters, four of whom are stationed at a firehouse in the City. Law enforcement is provided by 20 deputy sheriffs. Seventeen state police officers are stationed in the County. The crime rate in the County is lower than that in the City.

The County operates a landfill. Garbage is collected by private contractors. Road construction and maintenance and snow removal services are provided by the Commonwealth. The County provides no curbs, gutters, storm sewers, sidewalks, or street lighting except in one residential subdivision.

The annexed area has a population of 4,607. It contains about 13% of the County's property tax assessed values. The County's total taxable property was assessed at over one billion dollars in 1980. The annexed area, which almost entirely surrounds the City, contains the County's only shopping mall, the County's only large supermarket, all the County's major motels, and 97.9% of the County's water customers. More than 200 commercial and industrial firms, many of which migrated from the City, are situate in the annexed area. The area contains five major residential subdivisions. Yet, 58% of the annexed area consists of open pastures, woodlands, or croplands.

In addition to the area annexed, the City sought to annex approximately 2.5 square miles lying southwest of the City. This area, which came to be known as Study Area 3, was adjacent to the Town of Dayton, and the Commission on Local Government recommended that it remain in the County as a buffer zone between the City and the Town. The annexation court concurred and omitted Study Area 3 from the annexed area.[1]

## II. *The 1979 Act*

Relations among units of local government pose problems of continuing concern to the General Assembly. Different people in different communities have different needs for different reasons. Government seldom has sufficient resources to provide all it would like to give its citizens and never all they would like to receive. Necessarily, needs and means must be balanced and compromises must be reached. How well local governments succeed in promoting the common weal depends in large part upon how they are organized and how they interact with their neighbors.

Relations between cities and counties became so strained in 1971 that the General Assembly created the Commission on City-County Relationships to study the problem and, pending the

---

[1] County landowners seeking annexation of two small parcels outside the area the City sought to annex were permitted to intervene as petitioners. The court approved one petition and rejected the other.

study, imposed a moratorium on annexations of counties by cities and upon incorporation or consolidation of cities. Acts 1971, c. 234.[2] The Commission reported its findings and recommendations to the Governor and the General Assembly in January 1975. The report was published as House Document No. 27 (hereinafter, H.Doc.27). We find this report particularly helpful in our analysis because many of its recommendations were enacted into law as part of the 1979 Act. A portion of the report is quoted in the margin.[3]

---

[2] The Commission was directed to consider, *inter alia:*

(a) Whether annexation is the appropriate technique to use for the addition of territory to cities and towns, and, if not, what techniques are available and might be employed;

(b) What changes in the annexation statutes should be made and with what purpose in mind;

(c) Whether counties should be given the right to become incorporated as cities as they attain certain characteristics, and by what method and criteria such characteristics should be evaluated and determined;

(d) Whether the system of independent cities . . . should be modified or abolished
. . . .

[3] Writing of the propriety of annexation as a means to adjust municipal boundaries, the Commission said:

It has been common practice for state legislatures to prescribe formal procedures for the creation of municipalities and the expansion of municipal boundaries. Their purpose in doing so was to provide urban areas with governmental forms which were appropriate to their proper functioning. Historically these practices have been based upon the belief that urban areas should be governed by cities and that rural areas should be governed by counties. As this country has urbanized and as urban settlements have grown, so also have the corporate limits of cities. As new urban concentrations were formed within counties, they have become incorporated as municipalities.

Annexation has been widely used to keep pace with population growth and the spread of urbanization beyond city boundaries. It is the method most cities have used to reach their present dimensions. However, in the middle decades of this century the wholesale appearance of the automobile and the availability of modern roads spurred urban development to such an extent that cities failed to keep abreast of the spreading urbanization. Counties which experienced this surge of development began to adjust to their urbanizing condition. This fact has often adversely affected interlocal relations in Virginia, particularly with respect to municipal boundary expansion. Though the process of annexation seems well suited for small and moderate sized cities of the state where the expansion of boundaries can be judged on the basis of service provision and the traditional considerations of "necessity and expedience," the propriety of such boundary changes involving the state's highly urbanized counties, which provide a full array of urban services, is problematical at best.

Recognizing that many modern counties are willing and able to provide a full array of urban services, the Commission recommended limitations on the cities' power to annex. The principal recommendation was to grant densely populated counties which provide urban services an immunity from annexation and from incorporation of cities from within. In the 1979 Act, this proposal, modified somewhat, became Code §§ 15.1-977.19:1 *et seq.* The Commission also recommended that such counties be permitted to incorporate as cities. This recommendation was also adopted by the legislature. Code §§ 15.1-977.1 *et seq.*

As an alternative to "territorial expansion of cities", the 1979 Act provided for "economic growth sharing", an arrangement by which a city may relinquish its authority to annex in return for a county's agreement "to share in the benefits of the economic growth of their jurisdictions". Code §§ 15.1-1166, -1167. Cooperation among local governments for provision of services was encouraged in § 15.1-1166(B) and in § 15.1-1041(bl)(v).

---

The delivery of urban services by county governments in these areas has undercut much of the rationale and, more importantly, the popular support for city annexation. While cities can argue that they alone provide a full range of urban amenities for their citizens, counties may counter with arguments that all the essential service needs of their residents are being met. Cities buttress their case for annexation with the assertion that county residents — especially those who live in the suburban fringe areas around cities — are dependent upon the city for social, cultural, and occupational opportunities. City representatives assert that a "community of interest" exists between the residents of the suburban county and the central city. In addition, it is often maintained that expansion of city boundaries is necessary in order to provide ample land for the city to develop and grow. In short, as counties have become vehicles for the delivery of urban services, city arguments in favor of boundary expansion have tended to shift from service provision to the maintenance of the political, economic, and social viability of the city itself. Annexation, instead of serving as a means to distribute city benefits to once-rural areas, has become a means of extending to suburban residents their share of the operating costs and social responsibilities of a city upon which they ultimately depend. While the Commission on City-County Relations has seen virtue in the arguments favoring the territorial growth of cities, it has also recognized the cost and the disruption caused by city expansion in certain areas of the state.

Annexation in the more urbanized areas of the state carries with it extreme costs. Legal expenses, consultants' fees, administrative disruption, interlocal hostility, and popular discontent all combine to challenge the benefits that are derived from the annexation of heavily urbanized counties. If inequities in resources exist between cities and counties in metropolitan areas, it is the state's role to provide fiscal remedies that will sufficiently ensure the existence and the continuance of strong and viable local governments.

H.Doc.27, 25-28 (footnotes omitted).

Another significant change made by the 1979 Act was the creation of the Commission on Local Government, whose mission is to "help ensure that all of [the] counties, cities and towns are maintained as viable communities in which their citizens can live." Code § 15.1-945.1. The Commission is empowered, *inter alia,* "[t]o investigate, analyze, and make findings of fact . . . as to the probable effect" of any proposed annexation, declaration of immunity from annexation, incorporation of town or city, or transition from county to city. Code § 15.1-945.3(H). The report of the Commission's findings and recommendations is admissible in evidence "in any subsequent proceeding relating to the subject matter thereof." Code § 15.1-945.7(B). Applying its statewide experience in analyzing other cases, the Commission can bring to bear knowledge and insight which may be vital in deciding the complex issues faced by an annexation court. Manifestly, the Commission on Local Government was created to ensure uniform procedures for the maintenance of viable units of local government.

Other changes made in the annexation statutes in 1979 are largely procedural or clarifying. Some merely codify case law. We will discuss only those pertinent to our analysis.

As we interpret the content of the 1979 Act and its legislative history, we reach five conclusions. First, the state favors cooperation, rather than competition, among local governments. Second, annexation courts must balance the interests of the people in all the areas concerned. Third, annexation may not be warranted where urbanized counties already provide adequate urban services. Fourth, the state's interest in maintaining strong local governments is an important consideration. Fifth, the findings and recommendations of an impartial administrative agency will help to protect and promote that interest.

With these conclusions in mind, we turn to the merits of the case.

### III. *Necessity and Expedience*

Essentially, the County's complaint is that the evidence was insufficient to prove that annexation is necessary and expedient.

An annexation court must

determine the necessity for and expediency of annexation, considering the best interests of *the people of* the county and the city or town, services to be rendered and needs of *the*

*people of* the area proposed to be annexed, the best interests of *the people in* the remaining portion of the county *and the best interests of the State in promoting strong and viable units of government.*

Code § 15.1-1041(b) (italics identify language added to the statute by the 1979 Act).

█ Factors to be considered in determining "the best interests" were codified for the first time in 1979 and added to § 15.1-1041 as subsection (b1), which is fully set forth in the margin.[4] We commend the annexation court for its exhaustive analysis of the

---

[4] (b1) In considering the best interests, as set out in (b) hereof, the court shall consider to the extent relevant:

(i) The need for urban services in the area proposed for annexation, the level of services provided in the county, city or town, and the ability of such county, city or town to provide services in the area sought to be annexed, including, but not limited to:

(a) Sewerage treatment,
(b) Water,
(c) Solid waste collection and disposal,
(d) Public planning,
(e) Subdivision regulation and zoning,
(f) Crime prevention and detection,
(g) Fire prevention and protection,
(h) Public recreational facilities,
(i) Library facilities,
(j) Curbs, gutters, sidewalks, storm drains,
(k) Street lighting,
(l) Snow removal,
(m) Street maintenance;

(ii) The current relative level of services provided by the county and the city or town;

(iii) The efforts by the county and the city or town to comply with applicable State policies with respect to environmental protection, public planning, education, public transportation, housing, or other State service policies promulgated by the General Assembly;

(iv) The community of interest which may exist between the petitioner, the territory sought to be annexed and its citizens as well as the community of interest that exists between such area and its citizens and the county. The term "community of interest" may include, but not be limited to, the consideration of natural neighborhoods, natural and man-made boundaries, the similarity of needs of the people of the annexing area and the area sought to be annexed;

(v) Any arbitrary prior refusal by the governing body of the petitioner or the county whose territory is sought to be annexed to enter into cooperative agreements providing for joint activities which would have benefited citizens of both political subdivisions; however, the court shall draw no adverse inference from joint activities undertaken and implemented pursuant to cooperative agreements of the parties. It is the purpose of this subsection to encourage adjoining political subdivisions to enter into such cooperative agreements voluntarily, and without apprehension of prejudice;

statutory factors. It is unnecessary for us to repeat the exercise in great detail.

## A. Needs of the Annexed Area

Comparing the respective abilities of the County and the City to provide the urban services listed in subsection (bl)(i),[5] and the current level provided by each, subsection (bl)(ii), the court found the City superior in 12 of the 14 categories. The court also concluded that annexation would not impair the level of performance in the other two. Reviewing the considerations required by subsection (bl)(iii), the court noted that the City had made "efforts . . . to comply with applicable state policies" in the fields of public housing and public transportation, while the County had done little or nothing in these areas.

The County does not seriously challenge the findings that the City is better able to provide public services, and we are satisifed the evidence is sufficient to support them. However, the County raises several arguments in an attempt to minimize the significance of these findings.

■ The County says that the law no longer recognizes the proposition that urban areas must be governed by cities, now that modern counties are fully capable of providing urban service needs. We agree. *See, e.g., Alexandria* v. *Fairfax,* 212 Va. 437, 184 S.E.2d 758 (1971). The immunity clauses built into the annexation statutes are a legislative acknowledgement of that fact. But Rockingham County's low population density makes it ineligible for the total immunity provided by Code § 15.1-977.21. Perhaps parts of the annexed area could qualify for the partial immunity authorized in Code § 15.1-977.22:1; but, significantly, the

---

(vi) The need for the city or town seeking to annex to expand its tax resources, including its real estate and personal property tax base;

(vii) The need for the city or town seeking to annex to obtain land for industrial or commercial use, together with the adverse effect on a county of the loss of areas suitable and developable for industrial or commercial uses; and

(viii) The adverse effect of the loss of tax resources and public facilities on the ability of the county to provide service to the people in the remaining portion of the county.

[5] We do not perceive that the listing of those services has worked a change in the test for annexation. The courts have always considered such services in determining necessity and expedience. *See, e.g., Roanoke and Salem* v. *Roanoke County,* 214 Va. 216, 198 S.E.2d 780 (1973); *Johnston* v. *County of Fairfax,* 211 Va. 378, 177 S.E.2d 606 (1970).

record before us does not show that the County sought such immunity.[6]

Under the legislative scheme, when a county cannot qualify for immunity, it remains a matter of proof which local government can better serve an area proposed to be annexed, and the question must be resolved by the traditional necessity-and-expediency analysis.

The County argues that the services it provides are adequate and that the added level of services the City could provide, while arguably desirable, is unnecessary. For example, the evidence showed that some residents of subdivisions in the County had no wish for curbs and gutters on their streets.

The urban services listed in subsections (bl)(i) and (bl)(iii) are those the legislature believes typical urban areas need and those typical urban governments should provide. *See also* Code § 15.1-977.22:1. To deny the need for such services is to deny the area's urban status. Urban areas need urban services despite the wishes of individual residents. *Henrico* v. *City of Richmond,* 177 Va. 754, 788-89, 15 S.E.2d 309, 321 (1941); *accord, County of Norfolk* v. *Portsmouth,* 186 Va. 1032, 1041, 45 S.E.2d 136, 140 (1947).

The County points out, however, that 58% of the area ordered annexed is currently either vacant or employed in agricultural pursuits. The alleged impropriety of the annexation of this land is a theme that recurs in several arguments raised by the County. In the present context, the County contends that these undeveloped lands have no need for urban services.

We can agree in part. Very likely, the large farms and vacant areas have no immediate need of utility-type services, such as water, sewerage, and street lighting. Nor do they require the greater police or fire protection more heavily populated areas need. But even today they need land-use planning, and expert testimony showed that planning for the annexed area and the present City should be done by one government rather than two.

It is in the planning context that the annexed area's need for the full range of urban services becomes clear. The County's own Master Plan specifically anticipates and provides for urbanization of most of the annexed area. Planning by the Virginia Department

---

[6] For the procedure for acquiring immunity and provisions for stay of annexation suits pending the immunity inquiry, see Code § 15.1-977.20.

of Highways and Transportation for the greater Harrisonburg complex was predicated upon the Department's prediction that a substantial part of the City's environs, including most of the annexed territory, will be urbanized by 1995. As the process of urbanization gains momentum, the rural parts of the annexed territory will need more and better urban services. *See Montgomery County v. Blacksburg,* 212 Va. 528, 186 S.E.2d 282 (1972).

We are of opinion the evidence supports the court's finding that the City would best be able to serve the needs of the annexed area.

### B. Best Interests of the City

Code § 15.1-1041 requires that the annexation court consider the City's need to expand its tax resources and its need of land for commercial and industrial use.[7] The County says that the City has shown a need for neither.

### 1. The City's Tax Resources

Harrisonburg currently enjoys sound economic health. It has one of the lowest property tax rates among cities in the Commonwealth. It has borrowed only a small fraction of its statutory indebtedness limit. Yet, it currently provides what the evidence showed to be a generally excellent level of a full complement of urban services appropriate to a city of its size.

The County insists that the City's prosperity conclusively demonstrates that the City has no need to expand its tax resources. But a city's economic well-being has never been a bar to annexation. Quite to the contrary, annexation has been denied where a city is financially weak; a city may be unable to bear the burden of providing urban services to an increased area if it is having problems meeting its present needs. Compare *Roanoke and Salem v. Roanoke County,* 214 Va. 216, 198 S.E.2d 780 (1973), where the evidence showed a strong, viable city which could afford to serve the proposed annexation area, with *City of Roanoke v. County of Roanoke,* 204 Va. 157, 129 S.E.2d 711 (1963), where

---

[7] Subsections (bl)(vi) and (bl)(vii), *see* note 4, *supra.* These subsections are also a codification of factors previously identified by this Court. *E.g., Alexandria v. Fairfax,* 212 Va. 437, 184 S.E.2d 758 (1971) (need for tax revenue a factor but not sufficient reason of itself for annexation); *City of Roanoke v. County of Roanoke,* 204 Va. 157, 129 S.E.2d 711 (1963) (need for land).

the same city was properly denied annexation at a time when it was economically weak. *See also Alexandria* v. *Fairfax,* 212 Va. 437, 184 S.E.2d 758 (1971); *Higgins* v. *Roanoke,* 212 Va. 399, 184 S.E.2d 815 (1971); *Fairfax County* v. *Town of Fairfax,* 201 Va. 362, 111 S.E.2d 428 (1959).

Although the City is economically sound today, expert testimony justifies the City's contentions that it is approaching the point of fiscal stasis. The evidence showed that the City's non-James Madison University population had increased only slightly in the last two decades. Yet, the City has found it necessary to allocate public funds to low-income housing projects. During the time the annexation suit was pending, a private concern developed a shopping mall east of the City in the annexation area. Several small businesses and two large department stores had closed their doors in the City and moved to the mall. While downtown Harrisonburg had once been the principal shopping center for both the City and the County, many people now consider the mall complex their chief shopping area. While other businesses have partially filled the void left by the emigration from the City, several vacant storefronts remain. Although the City's sales tax receipts have continued to increase yearly, the rate of increase is much lower than before.

It would be a gross exaggeration to say that the City is dying. But competent evidence supports the court's finding that the City will soon need a larger tax base. Certainly, there was evidence to the contrary, evidence which showed that the City would continue to enjoy good health and that creative management could better promote the commercial development of downtown Harrisonburg. Conflicts in the evidence must be resolved by the annexation court as finder of fact. Where credible evidence supports its findings, as it does here, we will uphold them. *See Christiansburg* v. *Montgomery County,* 216 Va. 654, 222 S.E.2d 513 (1976).

2. Need of Land for Commercial and Industrial Development

a. Code § 15.1-1041(bl)(vii)

There are nearly 1,000 acres of unimproved land within the existing City limits. The County emphasizes that this is more than all the vacant land contained in the area given the City in its last annexation in 1962. This proves, the County says, that the City does not need more land for development.

The City's evidence showed that large portions of its vacant areas were either geologically, topographically, or environmentally unsuited for development; other portions were undesirable for lack of easy access to major arteries of transportation; and what was not otherwise unsuitable consisted of parcels too small to attract modern industries.

While industrial development of Harrisonburg's vacant land is not impossible (one industry opened a new plant in the City shortly before the trial), there has been no substantial industrial development within the City in recent years. Primarily, this is because the City's vacant land simply is not competitive with the vast expanse of developable land in the County. Unless this competitive imbalance is alleviated, the City will find it difficult, if not impossible, to increase its tax yield enough to keep pace with escalating budgetary demands.

But, the County contends, even if the City needs more vacant land, it does not need all the court granted. On the final day of trial, the County's expert, while never conceding that any annexation was necessary and expedient, proposed a line encompassing an annexation area approximately half as large as that the court granted.

It may be, as the County asserts, that the vacant land embraced in its alternative proposal is sufficient to satisfy the City's development needs in the near future. The court based its decision on a projection of the City's needs "for the next 10 to 15 years." Considering the prospect that some of the vacant land annexed will be used for urban development other than commercial and industrial, we do not feel the court's projection was unrealistic. Even if we felt otherwise, we would not reverse the court's order. "No single factor controls in determining the necessity and expediency of annexation", *Fairfax County* v. *Town of Fairfax,* 201 Va. 362, 368, 111 S.E.2d 428, 433 (1959), and we have already concluded that the court was correct in finding that the entire annexed area was in need or soon would be in need of the urban services the City could provide.

Code § 15.1-1041(bl)(vii) requires the court to balance a city's need for additional land against the adverse effect on the county of the loss of the potentially developable areas. The County complains of that loss here. The evidence shows that the remaining County has substantial areas of developable land. The Commission on Local Government found high potential for indus-

trial development in the Elkton area and in the Route 11-Interstate 81 corridor south of the annexed area. Moreover, shortly before trial, the County was engaged in the process of amending its Master Plan to de-emphasize urban development around the City of Harrisonburg and to provide foci for such development around several towns and large communities elsewhere in the county.

### b. Code §§ 15.1-1506 et seq.

 "It is State policy to conserve and protect and to encourage the development and improvement of its agricultural . . . lands". Code § 15.1-1507. The County argues that annexation of the "prime" agricultural land within the annexed area offends this policy.[8]

We disagree. No harm to the state's agricultural promotion policy will flow from the annexation. True, urbanization of the farms will destroy them as farms, but we have seen that urbanization will occur eventually regardless of annexation. And, for the short term, the annexation order expressly protects the farms. The County had adopted an agricultural land-use assessment ordinance, pursuant to Code §§ 58-769.4 et seq. The annexation court has ordered the City to adopt a similar ordinance.[9] The machinery specially provided for promotion of the policy defined in Code § 15.1-1507 is as functional in a city as in a county. Code §§ 15.1-1508(G), -1509(A).

### C. Cooperation and Intransigence

 The County charges that the City arbitrarily refused to cooperate with the County for the joint provision of public services. The court found that, while there had been some "bickering" between the City and County, both parties had "been looking

---

[8] While the annexation court's special consideration of this policy was salutary, we note that the annexation statutes nowhere specifically require the court to consider this policy or to give it precedence over other state policies. See Code § 15.1-1041(bl)(iii) ("State service policies"). The paramount state interest in annexation is "promoting strong and viable units of government." § 15.1-1041(b).

[9] We granted leave to Albemarle, Augusta, Campbell, and Prince George Counties to file a brief amici curiae. While we have given consideration to the counties' arguments, we will not consider an "assignment of error" they raise challenging the propriety of the court's ordering the City to adopt a land-use assessment ordinance. Only a party-litigant may assign error.

out for their own interests as they perceive them." Actions prompted by a reasonable perception of legitimate self-interest are not arbitrary.

While arbitrary refusal to cooperate will be held against a party, Code § 15.1-1041(bl)(v) provides that "the court shall draw no adverse inference from joint activities undertaken and implemented pursuant to cooperative agreements". The County believes the court drew two such inferences from its joint activity with the City in the provision of sewerage and water services.

The City controls a virtually unlimited water supply with sources in lakes and rivers. The County has no large surface-water supply but was engaged in the development of wells in the annexed area. While the wells had substantial potential, they are insignificant in comparison with the City's sources. Under an agreement with the County, the City is providing water to many customers in the annexed area, and the court found the City better able than the County to serve the entire area.

The County and the City are two of the partners in a regional sewerage authority. The County appropriated funds to help finance a part of the authority's facilities, and the City had lent its credit for construction of the system. The court found that "[t]he City has a longer history of providing [sewerage] services and would . . . more readily lend its credit and resources to the task."

We think neither of these findings resulted from inferences condemned by the statute. Both findings are adverse to the County, but they were not based upon inference drawn from the County's joinder in cooperative agreements. Rather, they were based upon a comparison of past performance of service and capacity to provide additional service to meet future needs.

We have been asked to explicate the meaning of the statutory bar against adverse inferences. The task is not easy, for the question is only faintly illuminated by legislative history.

At the present time contiguous cities and counties are most reluctant to enter into cooperative agreements and joint activities with one another for fear that such programs will adversely affect their cases in future annexation proceedings. *Since the courts in annexation cases consider community of interest,* now a factor based solely on judicial precedent, *counties fear that joint programs with cities will be construed to indicate that such a community of interest exists.*

The existence of a community of interests between areas involved in an annexation issue has traditionally served to strengthen the case of the annexing municipality. Likewise, cities, too, have sometimes been hesitant to enter into agreements with counties for the provision or the receipt of urban services. Cities fear that their provision of services to counties will undermine their future annexation cases since those cases are expected to rest, at least in part, on the need for services in the area to be annexed. Acceptance by the city of county services may also be opposed for similar reasons. Thus, the possibility of annexation can create barriers to interlocal cooperation.

The Commission believes that these barriers should and can be reduced. Therefore, *the Commission recommends that cooperative agreements and joint activities be explicitly removed from consideration in annexation cases, except where localities fail to pursue collaborative efforts in good faith.* Annexation courts should be empowered to consider either an arbitrary refusal by a locality to consider cooperative ventures or negotiations which are not pursued in good faith . . . .

H.Doc.27, 45-46 (emphasis added).

We believe § 15.1-1041(bl)(v) was intended to have the effect recommended by the Commission on City-County Relationships: explicitly to remove cooperative activities from consideration of community of interest except where one of the local governments arbitrarily refuses to cooperate. Giving the provision such effect, we see that the court drew no impermissible inference in its finding that the annexed area shares a greater community of interest with the City than with the County. That finding was based upon uncontradicted evidence that the City was the banking, commercial, cultural, governmental, employment, recreation, and transportation nucleus of the area.[10]

### D. Adverse Impact on County

■ The loss of tax sources in the annexed area would result in a loss of revenue equivalent to approximately 13% of the County's

---

[10] The County does not challenge the court's finding on community of interest, *see* Code § 15.1-1041(bl)(iv), note 4, *supra.*

total estimated annual revenue. This is an adverse impact under § 15.1-1041(bl)(viii), but it is offset by provisions of the court's order directing the City to compensate the County for loss of tax revenues[11] and to assume a portion of the County's debt. *See Fairfax County* v. *Town of Fairfax,* 201 Va. 362, 111 S.E.2d 428 (1959).

The Commission on Local Government and the annexation court found that Rockingham County has considerable potential for future development.[12] Evidence indicated that industries had shown an interest in developing sites in the County outside the annexed area. One new industry recently located there will, when fully assessed, add fifteen to twenty million dollars to County property assessables. Considering the court-ordered compensation and the County's potential for growth, we think the impact of the County's loss of tax assessables is not a controlling factor in the annexation equation.

Annexation rarely benefits all the parties involved and usually harms the County, at least initially. *See Fairfax County* v. *Town of Fairfax,* 201 Va. at 368, 111 S.E.2d at 433. The City is not required to prove, as if each were indispensable, all the factors set out in § 15.1-1041(b); it need prove only, on balance, the overall necessity for and expediency of annexation. *See Johnston* v. *Fairfax County,* 211 Va. 378, 382, 177 S.E.2d 606, 608-09 (1970). We conclude that the evidence shows that the annexation benefits to the City and to the annexed area substantially outweigh any temporary harm the County may suffer.

### E. Best Interests of the State

The County insists that the State's interest in maintaining "strong and viable units of government", § 15.1-1041(b), will be disserved by annexation. Annexation will strengthen the City,

---

[11] We will address the County's challenge to the amount of the compensation award later.

[12] The County attacks this "growback" theory as one which we have specifically rejected, citing *County of York* v. *Williamsburg,* 204 Va. 732, 744, 133 S.E.2d 520, 528 (1963). There, we held that any potential "growback" would not reduce the amount of compensation for loss of revenue which the City would be required to pay pursuant to Code § 15.1-1042(c). However, we recognized that, outside the context of revenue compensation, our earlier cases had stated that potential for growth was a factor in deciding adverse impact, since "a considerable loss of revenue to the county results from nearly every annexation case". *Id.* We believe that, in assessing the long-term viability of the County, potential for growth is a relevant consideration.

which is already strong, but materially weaken the County, it says.

The Commission on Local Government is charged with protection of this State interest. Acknowledging the adverse effects this annexation could have on the County, the Commission addressed the question of the State's interest:

> Clearly, the interest of the State in this annexation, and all others, is a careful analysis and reconciliation of the individual interests of the parties and the continued viability of each. The term "viability" in this context involves, from our perspective, two distinct, but interrelated concerns — (1) the provision of services to protect the public's health, safety, and welfare and (2) the fiscal capacity to provide such services. While not all of these issues are readily susceptible to quantification and mathematical analysis, and are not always entirely free of subjective judgment, it is the unanimous view of this Commission that the interests of the State are served by an expansion of the boundaries of the City of Harrisonburg. . . .

It is hard to conceive a case in which the State's interest would not be served if a balancing of the other interests enumerated in § 15.1-1041(b) shows necessity and expedience. Clearly, the best interests of the people of the County would not be served if the County's viability as a unit of government were destroyed, and, by the same token, the State's interest would be impaired. Thus, we believe the 1979 Act added the State-interest standard to the annexation test primarily to emphasize that annexation is more than a purely local question. *See* H.Doc.27, 42. And the addition helps relate that test to the role the Commission on Local Government is required to play. Code § 15.1-945.1.

■ Since the evidence shows that Rockingham County will continue to have the capacity to serve its people as a viable unit of government, we agree with the City that annexation satisfies the state-interest standard.

■ Having considered all the factors in the statutory test, we hold that the evidence supported the court's determination that the annexation was necessary and expedient. We turn now to the executory provisions of the annexation order.

## IV. *The Annexation Order*

The annexation order conforms in all essential respects with the requirements of Code § 15.1-1042. Without discussing all the terms and conditions of the order, we will examine those challenged by the County.[13]

### A. Transfer of Sewerage and Water Facilities

The court ordered the County to transfer to the City title to most of its water and sewerage facilities in the annexed area. It required the City to pay the County $2,110,053 for these assets. The County does not question the court's power to order transfer of public facilities, a power implicit in § 15.1-1041(bl)(viii) and § 15.1-1042(c). The court exceeded its power, the County argues, because some of these facilities "will be needed by the County to provide services to the remaining County." The County complains about the transfer of a water storage tank in the annexation area designed to serve an area east of the annexation area.

Thus, the County attempts to limit transfers to those facilities designed to serve only the annexation area. There is no support for such a limitation in the statutes or in our decisions. The annexation court is directed to "balance the equities in the case" and "enter an order setting forth . . . fair and reasonable terms and conditons." Code § 15.1-1042. Necessarily, the court must have some measure of flexibility and discretion. While there are equities in both pans of the scale, we cannot say that the court abused its discretion in ordering title to these facilities transferred to the City. The court ordered compensation calculated at replacement value. It seems unlikely that developing areas of the remaining County will be denied essential services; the City has repeatedly demonstrated its willingness to cooperate with the County in providing such services to County residents.

The County also argues that the transfers unlawfully impair certain rights the County had under contracts with the City for the provision of water. We will assume, without deciding, that contract rights were affected. But the court must look to all interlocal relationships, including those formalized by contract, and, where necessary to balance the equities, the court has power to

---

[13] What we have said concerning the annexation of large areas of agricultural land is sufficient to dispose of the question presented by the County's tenth assignment of error, invoking the provisions of Code § 15.1-1042(a).

readjust contractual rights and obligations. *See County of York* v. *Williamsburg,* 204 Va. 732, 133 S.E.2d 520 (1963).

### B. School System Adjustments

Both the City and the County have excellent school systems. Annexation will remove 421 students from the County's schools and place them in the City's schools. This change will overtax the current capacity of the City's school plant.

As an interim measure, the City proposed to eliminate its junior high school. Seventh-grade students would attend the elementary schools; eighth-graders would attend high school. The City proposed to use the existing junior high school building, which is adjacent to the high school, to accommodate the additional high school students. It also proposed to add extra classrooms to other buildings before the beginning of the school year following annexation. Even with the additional classrooms, the City schools will be filled almost to capacity. The County schools, on the other hand, have some excess capacity. The City proposed to build, six years after annexation, a new junior high school and to return then to the three-tiered elementary-middle-high school format.

Additionally, annexation will so extend the City's boundaries that the City will, for the first time, be required to provide school bus service for its students, and the City submitted a plan to provide such service.

Although the court gave detailed instructions as to interim operations of the schools from the effective date of annexation until the beginning of the next school year, it said with regard to operation of the schools thereafter only the following:

> The City shall construct or make other provisions for such additional school buildings and other school facilities as are necessary to educate the additional pupils residing in the annexation area after the school session ending in June, 1982, consistent with the standards of quality education presently maintained by the City and required by the State Board of Education and the Commonwealth of Virginia. The City shall provide free bus transportation for school children beginning with the school session commencing on or about September 1, 1982.

The County attacks this provision as lacking the "detail" required by Code § 15.1-1041(d). This results, the County argues, from the City's failure to submit an acceptable plan. The County notes that directions for construction of capital improvements in other parts of the order were very specific and consistent with plans submitted by the City.

Nothing in the record supports the contention that the court found the City's school proposal unacceptable. Indeed, the proposal identifies itself as a good-faith plan to cope with what will admittedly be a difficult situation. The court did not impose that plan upon the City in detail, but this simply indicates that the court recognized that the City must have some flexibility in its capital improvements planning.

Because of possible changes in the size, age, and location of the school population, what may be a suitable plan today may prove to be unsuitable as conditions change. Six years from now, construction of the City's proposed junior high school facility may be ill-advised. And the City's current plan to return to a three-tiered school system may change in light of experience with a two-tiered system. Expert testimony indicated that a three-tiered system is not demonstrably superior.

While the order does not descend into minute detail, details are incorporated by reference. "[S]tandards . . . required by the State Board of Education" are elaborately particularized. The annexation court was concerned with the quality of education, a concern far more consequential than the specific sizes, locations, or costs of classrooms. From the bench, the court expressed its determination to maintain the present high quality of education in Harrisonburg's schools. The record is replete with indicia of the City's present standards, including class size, teacher-student ratios, course offerings, and proportion of students pursuing higher education. The annexation court is vested with jurisdiction to enforce its order for ten years after it becomes final. Code § 15.1-1047. If it should later appear the City does not intend to maintain the required standards, then will be time enough for the annexation court to supplement its order in greater detail.

We find that the order is sufficiently particular to satisfy the requirements of Code § 15.1-1041(d).

## C. Compensation for Prospective Loss of Tax Revenues

The annexation court is empowered to require an annexing City "to compensate the county in not more than five annual installments for prospective loss of net tax revenues during the next five years, to such extent as the court in its discretion may determine, because of annexation of taxable values to the city". Code § 15.1-1042(c). The County contends that the amount of compensation fixed by the court was inadequate. Its reasoning is two-fold.

First, the County charges that the court erred in failing to award compensation for certain prospective State and federal appropriations which annexation will cause it to lose. We disagree.

The loss this statute addresses is a county's loss of prospective "tax revenues" resulting from "annexation of taxable values." We construe this language to mean monies a county collects from taxes it levies upon assets, transactions, and privileges within its taxing jurisdiction. If the General Assembly had intended compensation awards to extend to all types of budgetary receipts, it would have said so. Since it did not, we hold that the funds a county hopes to derive from State and federal appropriations are not prospective "tax revenues" within the contemplation of Code § 15.1-1042(c).[14]

Our holding is reinforced by analogy to a related statute. A county is not entitled to compensation "for any portion of the cost [of public improvements transferred to an annexing city] contributed by any federal, State or other agency and not borne by the county". Code § 15.1-1043(b).

The County's second complaint is that the court failed to consider escalating costs in calculating prospective loss of net tax revenues.[15]

The City's expert computed the net loss for the County's current fiscal year at $1,609,640 and, multiplying that figure by five, concluded that the County was entitled to compensation in the total sum of $8,048,200. According to the County's expert, the

---

[14] The compensation awarded by the court included an allowance for the County's prospective loss of its share of State sales tax receipts. Since Code § 58-441.48 provides that, when such receipts are allocated and distributed among local governments, they "shall be considered as funds raised from local resources", we agree that such monies constitute "tax revenues" for annexation compensation purposes.

[15] We construe the phrase "loss of net tax revenues" to mean the loss measured by the difference between a county's loss of "tax revenues" as we have defined that term and the amount of budgetary expenditures annexation saves a county.

total should have been $14,435,079. The court determined that the annual net loss would be $1,700,000 and awarded the County compensation in the total sum of $8,500,000.

The County contends that the court should have adopted the escalation formula used by its expert. That formula made projections of prospective net losses in post-annexation years, based upon the County's history of rates of average annual increases in receipts and disbursements during the five ante-annexation years. Under that formula, the prospective net loss would be greater for each succeeding year after the first year of annexation.

The County's expert conceded that annexation courts had declined to apply his escalation formula in 34 of the 35 cases in which he had advocated it. In our view, that formula, resting as it does upon unpredictable variables, is largely speculative. But much the same can be said of the static formula the City invoked. Since all economic forecasts are inherently conjectural, we believe both static and escalation formulae are competent as evidence of prospective loss of net tax revenues. But neither is binding upon a court.

Code § 15.1-1042(c) *empowers* an annexation court to award a county compensation "to such extent as the court in its discretion may determine". The scope of that discretion, while not boundless, is very broad. "It is clear that this statute leaves to the discretion of the trial court (a) whether such compensation shall be allowed and (b) the extent of such allowance. . . ." *County of York* v. *Williamsburg*, 204 Va. 732, 743, 133 S.E.2d 520, 527 (1963).

The record shows that the court below did not adopt the City's formula in full or reject the County's formula altogether. The court announced that it had considered the effects of inflationary pressures as urged by the County and that it had discounted the amount the City predicted the County would save in budgetary expenditures. We find no abuse of the court's discretion, and we will uphold the compensation award it made.

We are persuaded by the evidence that the annexation court properly balanced "the equities in the case" and that its order sets forth "fair and reasonable terms and conditions". Code § 15.1-1042.

## V. *Conclusion*

Finding no error below, we will affirm the decision of the annexation court.

■ While we affirm the judgment in substance, we must make some non-substantive changes in the judgment order. Operative time deadlines set in the order were geared to midnight on December 31, 1981, the date the court directed annexation to take effect. Code § 15.1-1041(d). Since that date has passed pending this appeal, we will provide in our mandate that annexation take effect at midnight on December 31, 1982, and that all interrelated time deadlines be adjusted one year to conform with that change. And, pursuant to Code § 15.1-1050, we will certify a copy of our mandate to the Secretary of the Commonwealth.

*Affirmed.*