# City of Hopewell

## v.

## County of Prince George, et al.

Record No. 900083

## City of Petersburg

### v.

## County of Prince George, et al.

Record No. 900084

November 9, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Lacy, JJ., and Poff, Senior Justice

*Robert W. Wooldridge, Jr. (Charles S. Perry; John F. Anderson; McGuire, Woods, Battle & Boothe,* on briefs), for appellant. (Record No. 900083)

*C. Richard Cranwell (Tyler M. Moore; Patrick S. Shiel; Cranwell & Moore,* on brief), for appellee Prince George County. (Record No. 900083)

No brief or argument for the Board of Supervisors of the County of Prince George, Virginia. (Record No. 900083)

*G. H. Gromel, Jr. (Matthew J. Calvert; Michael R. Packer, City Attorney; Hunton & Williams,* on brief), for appellant. (Record No. 900084)

*C. Richard Cranwell (Tyler M. Moore, Patrick S. Shiel; Cranwell & Moore,* on brief), for appellee Prince George County. (Record No. 900084)

No brief or argument for the Board of Supervisors of the County of Prince George, Virginia. (Record No. 900084)

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In these consolidated appeals, the cities of Hopewell and Petersburg challenge the denial of their separate petitions for annexation of portions of Prince George County. Finding no error in the order denying annexation, we will affirm.

Pursuant to Code § 15.1-945.7(A), Petersburg, on April 4, 1985, filed with the Commission on Local Government (the Commission) notice of intent to petition for the annexation of approximately 23 square miles of Prince George territory. Then, on July

23, 1985, Hopewell filed a similar notice with respect to approximately 16 square miles of county territory.

As required by Code § 15.1-945.7(A), the Commission conducted hearings and otherwise investigated the annexation proposals of the two cities. On June 13, 1986, the Commission issued a consolidated report in which it recommended that Petersburg be permitted to annex two portions of county territory totalling 4.4 square miles. The Commission also recommended that Hopewell be allowed to annex three other portions of county territory totalling 8.0 square miles.

One week later, Petersburg filed its petition for annexation in the Circuit Court of Prince George County. On August 29, 1986, Hopewell followed with its annexation petition.

Prince George countered by filing with the Commission notice of intent to petition for immunity from annexation of 22.6 square miles bordering Petersburg and Hopewell. The annexation proceedings were stayed pending determination of the immunity requests.

In April 1987, the Commission reported that it was "unable to recommend a grant of immunity to any of the areas" for which Prince George sought relief. The following October, the county filed a petition in the Circuit Court of Prince George County for partial immunity from annexation of the same areas considered by the Commission. After a hearing, a three-judge court granted immunity to an area made up of the Fort Lee military reservation and an area known as "the Crossings" but denied the remainder of Prince George's request. We affirmed this action in *City of Hopewell* v. *County of Prince George*, 239 Va. 287, 389 S.E.2d 685 (1990) (the immunity case).

The cities' petitions for annexation were consolidated for trial. After a tour of the areas involved and five days of testimony, the three-judge court denied the petitions by final order entered October 19, 1989. We granted the cities' petitions for appeal on June 4, 1990.

## THE LOCALITIES INVOLVED

### *Hopewell*

Hopewell was incorporated as a city in 1916. As a result of three annexation proceedings, the most recent in 1969, the city has grown to an area of 11.3 square miles. The 1969 annexation

increased Hopewell's population by 2,158 persons. However, during the decade from 1970 to 1980, the city actually experienced a decline in population of 74 persons, from 23,471 to 23,397, or 0.3%. According to estimate, Hopewell's population in 1984 was 24,200 persons, an increase of 803, or 3.4% more than the 1980 figure. On the basis of the 1984 estimate, Hopewell has a population density of 2,142 persons per square mile.

### Petersburg

Incorporated as a town in 1748, Petersburg became a city in 1850. It has grown to its present size of 23.09 square miles through a series of annexation proceedings, the most recent occurring in 1972, when an area of 14.12 square miles was added. Census figures show that between 1970 and 1980, the population of Petersburg increased from 36,103 to 41,055 persons, or 13.8%. This increase, however, reflected the addition of 8,021 persons in the 1972 annexation. An estimate shows that by 1984 the city's population had declined to 40,800 persons, or 0.6% below the 1980 census figure. On the basis of the 1984 estimate, Petersburg has a population density of 1,767 persons per square mile.

### Prince George

Formed in 1702 from part of Charles City County, Prince George is one of the state's smaller counties, with an area of only 281.3 square miles. Between 1970 and 1980, the county's population declined from 29,092 to 25,733 persons, or a loss of 11.6%, reflecting the impact of Petersburg's 1972 annexation.[1] By estimate, the county's 1984 population was 25,900 persons, an increase of only 0.7% above the 1980 figure. On the basis of the 1984 population estimates, Prince George has a population density of 92 persons per square mile.

---

[1] The Commission stated in its report that Prince George suffered an additional population loss of 4,254 persons "as a result of the decrease in the number of persons residing in group quarters (principally at Fort Lee)." The Commission then noted that the 1970-80 population decline would have been "more dramatic" had Prince George "not benefited from demographic growth in other areas."

## THE AREAS PROPOSED FOR ANNEXATION

### Hopewell

According to a Hopewell exhibit, the city's proposal for annexation embraced an area of 15.6 square miles of Prince George territory, containing a total population of 2,320 persons, a school-age population of 213 pupils, and total assessed property values of $39.7 million. Based upon these figures, the area proposed for annexation by Hopewell includes 5.5% of the county's total land area, 8.9% of its general population, 4.3% of its school-age population, and 7.25% of its assessed property values.

### Petersburg

According to a Petersburg exhibit, the city proposed to annex 7.17 square miles of Prince George territory with a total population of 1,090 persons, a school-age population of 204 pupils, and total assessed property values of $25.9 million. Based on these statistics, the area proposed for annexation by Petersburg includes 2.5% of Prince George's total land area, 4.2% of its general population, 4.2% of its school-age population, and 4.7% of its total assessed property values.

## THE ISSUES

### I.
#### Adequacy of the
#### Trial Court's Written Opinion

Both Petersburg and Hopewell contend that the trial court failed to satisfy the requirement of Code § 15.1-1041(c) that "[i]n all [annexation] cases, the court shall render a written opinion." Petersburg describes the trial court's opinion as "vacuous." Hopewell characterizes it as "bare-bones."

▋ Both cities argue that we set the benchmark for an annexation opinion when we praised a trial court for its "exhaustive analysis" of the statutory factors to be considered in determining the best interests of the people involved in an annexation case. *Rockingham* v. *Harrisonburg*, 224 Va. 62, 75-76, 294 S.E.2d 825, 831 (1982). Because the trial court opinion rendered in this case fails to measure up to the *Rockingham* standard, the cities urge that

we should reverse and either award annexation or remand "for the issuance of a proper opinion."

It is true that we commended the *Rockingham* court for its "exhaustive analysis" of the issues in that case. And it may be that the trial court's opinion in the present case fails to qualify for a similar commendation. But it does not follow that an opinion mirroring the form, the length, and the depth of analysis of the *Rockingham* opinion is required in every annexation case.

■ Nor does it follow that the opinion rendered in this case is so deficient as to require reversal of the decree denying annexation. To the contrary, the opinion adequately states the trial court's reasons for the action taken, and we think the opinion is sufficient, despite its brevity, to satisfy the requirement of Code § 15.1-1041(c).

Hopewell also contends that the trial court's opinion is insufficient to satisfy the requirement of Code § 15.1-1049 that "[t]he [annexation] court shall certify the facts in the case to the Supreme Court." Hopewell argues that the Code provision requires an annexation court to make findings of fact in its written opinion and this, Hopewell says, the trial court failed to do.

■ If, as Hopewell contends, findings of fact are indeed required in an annexation court's written opinion, then the opinion in this case passes muster. In the opinion, the trial court made numerous findings with respect to the factors an annexation court must consider in determining the best interests of the people to be affected by annexation. *See* Code § 15.1-1041(b1). These were findings of fact. *See Johnston* v. *County of Fairfax*, 211 Va. 378, 384-85, 177 S.E.2d 606, 610 (1970). Hence, we reject Hopewell's contention that the trial court did not properly certify the facts to this Court.

## II.
### *Report of the Commission*
### *on Local Government*

■ Hopewell contends that the trial court erred "in rejecting the Commission's detailed findings of fact and reasoned recommendation that Hopewell be allowed to annex a portion of the County." However, we said in the immunity case that "the statutory scheme," which includes Code § 15.1-945.7 "makes plain that the Immunity Report shall be received in evidence" and given consideration "but that the trial court is not to be bound by the

report's findings and recommendations." *Hopewell v. Prince George*, 239 Va. at 295, 389 S.E.2d at 689.

By its terms, Code § 15.1-945.7 is applicable to immunity and annexation proceedings alike. Hence, what we said about the Commission's report in the immunity case applies with equal force to the Commission's annexation report in this case. All that was required of the annexation court was to consider the report and give it the weight it deemed appropriate. *Id.*, 389 S.E.2d at 689-90. There can be no doubt the court fulfilled that requirement.

III.

*Admissibility of Letter*
*Re: Wastewater Violations* ·

In its written opinion, the trial court found that all three localities were in compliance with applicable state policies as listed in Code § 15.1-1041(b1)(iii), concerning such matters as environmental protection, except that "the evidence disclosed substantial violations of applicable regulations in the operation of Petersburg's waste treatment plant on the Appomattox River." Petersburg contends that this finding was improperly based upon "the Burton Letter" which, Petersburg says, was improperly admitted into evidence.

The letter, in memorandum form, was sent by Richard N. Burton, Executive Director of the State Water Control Board, to an assistant attorney general. The letter related to Petersburg's alleged failure to comply with the terms of a consent decree entered by the Circuit Court of the City of Petersburg on May 19, 1987. Burton charged that Petersburg had failed to bring its wastewater treatment plant into compliance with the decree and to pay into a special fund an "incentive penalty" of $2,000.00 per day for each day the plant was in violation.

Even if we assume that the Burton letter was erroneously admitted, reversal is not required. The fact that Petersburg was in substantial violation of the terms of the consent decree was clearly established by other evidence, to which there was no objection. Accordingly, we hold that admission of the letter, if error at all, was harmless.

## IV.
### *Exclusion of the Testimony of a Rebuttal Witness*

Petersburg contends that the trial court erred in excluding the testimony of Julian Hirst, an expert Petersburg planned to call as a rebuttal witness. In a pretrial order entered January 30, 1989, the trial court required that "[e]ach party shall file on or before March 21, 1989 a list of witnesses, including expert witnesses, whom the party reasonably expects to call at trial." Petersburg filed its list on March 21 but did not include the name of Hirst as a prospective witness.

Petersburg says Hirst would have rebutted the testimony of Bill G. Evans, an expert called by Prince George, who testified at trial that Petersburg inefficiently managed its governmental affairs. Petersburg claims it did not know it would need Hirst as a rebuttal witness until well past the deadline for naming witnesses because Evans did not complete his pretrial deposition until just before the scheduled date for trial in September 1989.

The question is whether the trial court abused its discretion in refusing to allow Hirst to testify. *See Woodbury v. Courtney*, 239 Va. 651, 654, 391 S.E.2d 293, 295 (1990). In determining this question, we will assume, without deciding, that the court could have permitted the witness to testify, without regard to any discovery deadline.

■ We do not agree, however, that the trial court abused its discretion. Although Petersburg now claims it could not reasonably have anticipated the need for Hirst's testimony until after Evans had completed his pretrial deposition in early September 1989, Evans' name was on Hopewell's witness list, and he was there identified as connected with a management consultant firm. Petersburg knew as early as April 1989, when Evans began his deposition testimony, that he had made studies of the city's police, fire, and public works departments, which led him to believe that savings could be achieved through "more efficient operations."

Further, on July 7, 1989, Prince George filed answers to interrogatories propounded by Petersburg. From these answers, Petersburg was put on notice Evans proposed to testify at trial that the city could "substantially reduce the cost of delivering governmental services without impairing the level of services." Yet, Petersburg waited until almost the eve of trial to identify Hirst as a prospective witness. Under these circumstances, Petersburg should

not be heard to complain that the trial court abused its discretion in excluding Hirst's testimony.

## V.
### *Necessity for and Expediency of Annexation*

### A. Urban Services

Code § 15.1-1041(b1)(i) requires an annexation court, in determining the best interests of the people to be affected by annexation, to consider the "need for urban services in the area proposed for annexation, the level of services provided in the county, city or town, and the ability of such county, city or town to provide services in the area sought to be annexed." The section then lists thirteen items for consideration, beginning with sewerage treatment, continuing through public planning, subdivision regulation, and zoning, and ending with street maintenance.

The trial court found that "all three of the political subdivisions involved in these cases are providing, and are able to continue to provide, in the foreseeable future, adequate services, as needed," with respect to the thirteen items listed in Code § 15.1-1041(b1)(i). Petersburg attacks this finding, alleging that the trial court "failed to consider Petersburg's superior urban services capability and to determine which jurisdiction is better able to serve the present and future needs of the annexation area." Furthermore, Petersburg says, the trial court's finding "is not supported by the evidence in respect to the critical services of public planning, subdivision regulation and zoning."

Citing *Rockingham*, 224 Va. at 77, 294 S.E.2d at 832, and noting that the residents of the area proposed for annexation "may be content with the existing level of service," Petersburg opines that "[u]rban areas need urban services irrespective of what the residents may desire." This statement presumes, of course, that the area proposed for annexation is, or will be in the foreseeable future, an urban area. Interestingly, even Petersburg does not claim that the area proposed for annexation is urban now; as far as the future is concerned, Petersburg says only that "the territory proposed for annexation will experience increasing development in the near future, with a concomitant need for additional urban services."

■ Furthermore, the Commission said in its report: "[A]n analysis of the areas proposed for annexation reveals that, while exper-

iencing some development pressures, those areas remain sparsely populated. Accordingly, the urban service needs of the [areas proposed for annexation] are limited, and, thus, the provision of such services becomes less critical in the resolution of these annexation issues." In short, the Commission viewed the need for additional urban services in the areas proposed for annexation as a non-issue. We view the matter the same way.

## B. Community of Interest

The trial court found that there exists "very little community of interest between the City of Petersburg and its citizens and the citizens of the area it seeks to annex, that there is a slightly higher degree of community of interest between the citizens of the areas Hopewell seeks to annex and [Hopewell] and its citizens, and that a very high community of interest exists between the citizens of the areas sought to be annexed by both Cities and the remaining portions of the County and its citizens." Hopewell and Petersburg contend that the trial court's finding conflicts with the analysis made by the Commission with respect to community of interest.

The Commission's position on the subject of community of interest is ambiguous, to say the least. The Commission wrote: "With respect to the non-military properties in the areas proposed for annexation, we have no difficulty concluding that the Cities of Petersburg and Hopewell have been, and remain, the principal factors nurturing their development." Against this statement, in addition to other evidence, Prince George produced the testimony of Dr. Thomas M. Guterbock, a sociologist from the University of Virginia.

This expert conducted an intensive survey of 1,504 households in the cities of Petersburg and Hopewell, the areas proposed for annexation, and the remainder of Prince George. His survey questions covered numerous factors affecting community of interest. He expressed the opinion that the community of interest that exists between the Petersburg annexation area and the remainder of Prince George is "far greater" than the interest between the annexation area and Petersburg. He also stated his opinion that the community of interest between the Hopewell annexation area and the remainder of Prince George is "stronger" than the interest between the Hopewell annexation area and Hopewell.

Dr. Guterbock testified to the same effect in *Hopewell v. Prince George*, the immunity case. After quoting his testimony,

we observed: "[His] opinions, as well as the findings offered in support of the opinions and other County evidence, were entirely sufficient to support the trial court's community of interest conclusions." 239 Va. at 297, 389 S.E.2d at 690. We adopt that observation as dispositive of the community of interest question here.

## C. *Need to Expand Tax Base*

### Hopewell

Hopewell contends that "[t]he evidence before the trial court clearly established that Hopewell has a need to expand its tax resources, including its real estate and personal property tax bases." The Commission recognized its financial needs, Hopewell says, noting that in recent years, Hopewell has experienced less fiscal growth than Petersburg and Prince George and is among the most fiscally stressed localities in the Commonwealth. The testimony of several witnesses also demonstrated its fiscal stress, Hopewell states, and proved its need to expand its tax resources.

Offsetting this evidence, Prince George produced testimony showing that from the standpoint of true values of real estate per capita, adjusted gross income per capita, and taxable sales per capita, Hopewell was "the strongest of the three localities" involved, with Petersburg second and Prince George third. Prince George also showed that Hopewell was not taking full advantage of a sizeable machinery and tools tax base; only six other localities have a higher machinery and tools tax base and only one exceeds Hopewell on a per capita basis. By raising its tax rate to the Virginia average, according to the testimony, Hopewell could gain approximately 1.7 million additional tax dollars annually.

Furthermore, during 1987-88, Hopewell increased its assessed values by more than $100 million as a result of industrial expansion. In addition, at the time of trial, two cogeneration facilities were under construction and expected to add approximately $200 million to Hopewell's tax base.

█ Hence, there was a conflict in the evidence on the subject of Hopewell's need to expand its tax resources. The trial court resolved the conflict in favor of Prince George, and no legal or logical reason compels us to disturb the trial court's action.

## Petersburg

Emphasizing that it is "one of the most fiscally stressed cities in the State," Petersburg contends that, while it is fiscally sound, it "faces circumstances beyond its control that require augmentation of its financial resources." The circumstances over which it has no control, the city says, are "lethargic growth in real estate and public service corporation values, high local tax burden, high unemployment, loss of major businesses, and development trends in adjacent areas [caused by the construction of Interstate Highway 295 and the extension of Temple Avenue]."

The Commission had no difficulty, Petersburg maintains, in finding that " 'both current circumstances and prospective conditions underscore the City's need to augment its tax resources.' " Yet, Petersburg laments, the trial court, inexplicably, found that the city "has no need to expand its tax resources."

In making this finding, the trial court held that "Petersburg's problems, if not self-induced, are fully susceptible of correction by Petersburg, within its present boundaries." Petersburg contends that this holding is not supported by evidence and is the result of Prince George's injection of "a redherring into the case."

We disagree. At trial, Prince George produced two experts, Thomas G. Johnson, an econometrician, and Bill G. Evans, a management consultant. The testimony of these experts showed that Petersburg does not manage its fiscal affairs efficiently.

Johnson developed the Virginia Impact Projection Model, designed to "make appropriate comparisons and . . . predictions of [cities'] expenditures and revenues over time." He testified that Petersburg spends $87 annually per capita for fire protection while the average Virginia city with Petersburg's characteristics spends $59. Further, Petersburg spends $581 annually per capita on education against the average city's $414 per capita. For police protection, Petersburg spends $120 annually per capita compared to the average of $94.

Finally, on public works, Johnson testified that Petersburg spends $107 annually per capita, or $26 more than the $81 spent by the average city. Johnson opined that in 1988, Petersburg spent $8,398,321, or 17%, more than the average Virginia city. He also testified that Petersburg's "development expenditures" were significantly less than those of the average city.

Evans opined that Petersburg "could operate its fire department with 42 fewer firefighters than it now employs at a savings of $1.2

million a year" without affecting the department's current level of service. Evans also said that by re-scheduling the hours of police officers from the current four-day week to a five-day week and by making other changes, the city could save an additional $455,000 per year. Finally, Evans estimated that the city could save 35% of the cost of trash collection by using larger trucks and making pickups once a week, rather than the current practice of using small trucks and making pickups twice per week.

▌ If the trial court chose to credit the testimony of Johnson and Evans, as it obviously did, then there was evidentiary support for the holding that Petersburg's problems are susceptible of correction within its present boundaries. There was other support, however. Leonard Bogorad, a real estate analyst, testified that Petersburg could increase its property tax base to the extent of $660 million by developing the "best categories" of the vacant land within its present boundaries. He also said that by developing only 10% of its vacant land, the city could increase its real estate tax base by at least $66 million, or far more than the assessed values of real estate in the area proposed for annexation.

### D. *Need to Obtain Vacant Land*

#### Hopewell

Hopewell points out that Code § 15.1-1041(b1)(vii) required the Commission and the trial court to consider Hopewell's "need . . . to obtain land for industrial or commercial use."[2] Hopewell says there was "uncontroverted" testimony in the trial court that it has a need for vacant land. It notes that the Commission's report shows the city has only 715 acres, or 9.9% of its total land area, vacant and suitable for development. Of the vacant land, only 130 acres are zoned for future industrial use, only 52 acres are zoned for commercial use, and only 534 acres are suitable for residential use, much of which consists of small parcels containing 10 to 26 acres in size. Hopewell also points out that it produced several witnesses who substantiated the city's need for additional vacant land for industrial, commercial, and residential use.

---

[2] Hopewell correctly points out that while Code § 15.1-1041(b1)(vii) mentions only land for commercial and industrial use, an annexation court should also consider the need for residential land. *City of Roanoke* v. *County of Roanoke*, 214 Va. 216, 227, 198 S.E.2d 780, 788 (1973).

On the other hand, the county produced several experts who testified that while Hopewell has a scarcity of large vacant parcels and must depend to some extent on "infill" development, it has sufficient vacant space to satisfy its needs for the foreseeable future. One of the experts, Leonard Bogorad, testified that Hopewell has within its present boundaries 1,527 acres of vacant land that would accommodate 6,088 new housing units, 652,744 square feet of commercial buildings, and 5,370,000 square feet of industrial buildings.

Further, an exhibit introduced through Bogorad shows that the Petersburg Standard Metropolitan Statistical Area (SMSA), composed of the cities of Petersburg, Hopewell, and Colonial Heights and the counties of Prince George and Dinwiddie, will require only 108 acres of industrial land for the entire area in the next 10 years and that there are 436.5 acres of developable industrial land available in Hopewell alone. The exhibit also shows that the SMSA will require only 47 acres of commercial land in the same period and that Hopewell presently has 82.4 acres of developable commercial land available. With respect to residential land, the exhibit shows that the entire SMSA will need only 3,660 acres during the 10-year period and that Hopewell now has 6,173 acres of residential development capacity.

Another Prince George expert, Garland Page,[3] estimated that Hopewell's population would increase by only 400 persons between the years 1990 and 1995 and by only 1,700 between 1990 and 2000. With this "type of growth," the witness stated, "not a tremendous amount of land is going to be required to accommodate it."

Hence, there was conflict in the testimony concerning Hopewell's need for additional vacant land. The trial court resolved the conflict in favor of Prince George, and we cannot say the finding is not supported by credible evidence.

### Petersburg

Petersburg makes an even less-compelling case than Hopewell of its need for additional vacant land. The trial court

---

[3] Hopewell claims that Page made a "recommendation" on behalf of Prince George that Hopewell be allowed to annex approximately 8.2 square miles of county territory. It is clear, however, that Page merely drew a line he would consider "appropriate" in the event Hopewell's annexation request was found necessary and expedient by the trial court.

found that Petersburg had not demonstrated "any need to obtain additional land for industrial or commercial use." Petersburg says the trial court's finding "is inconsistent with the Commission's report." Our reading of the report, however, compels the view that the court's finding is entirely consistent with the report.

In the report, the Commission points out that Petersburg has 5,035 acres, or 33.7% of its total land area, "vacant and amenable to development." Of the total developable acreage, 685 acres are zoned for industrial use. In addition, the city has 13 vacant industrial buildings, containing 2.1 million square feet of floor space, available for "industrial initiatives." Petersburg also has 528 acres of vacant land zoned for commercial use and 1,730 acres zoned for residential purposes.

The Commission concluded that "the data indicate that the City of Petersburg retains an *extensive* amount of vacant land suitable for industrial, commercial, and residential development." (Emphasis added.) The only solace Petersburg can draw from the report is the statement that "the construction of Interstate Highway 295 will have a centrifugal influence on development in the general area, adversely affecting the competitiveness of *some* of Petersburg's commercial and industrial properties." (Emphasis added.) This statement does not form a sufficient basis for reversal of the trial court's findings on the subject of Petersburg's need for additional vacant land.

E. *Adverse Effect of Annexation upon County's Ability to Provide Services*

The trial court found that the "granting of any substantial portion of the petitions of either [Hopewell or Petersburg] would have a substantial adverse effect upon the County's future ability to provide services to the people in the remaining portion of the County." Hopewell and Petersburg contend that this finding is without any evidentiary basis and is plainly wrong.

In support of their position, Hopewell and Petersburg cite the Commission's report. However, what the Commission had to say about the effect of the Petersburg annexation proposal is not at all convincing: "[T]he recommended award should have little or no effect on the County's facilities and public services." The Commission's comment on Hopewell's proposal is even less convincing:

[T]he [recommended] award does not remove from the County any of its industrial sites. . . . The award does, however, propose the annexation of Lee Plaza [Shopping Center] and its adjacent property, which constitutes the County's largest concentration of commercial activity. Annexation of this commercial area is, however, justified by the relative fiscal needs of the two jurisdictions.

But aside from the Commission's report, the trial court could properly conclude from the evidence that the annexation proposals, if granted, would have substantial adverse effect upon Prince George. According to the cities' exhibits, the proposals together would have divested the county of 22.77 square miles, or 8% of its territory, removed 3,410 persons, or 13.1% of its population, and extracted 11.95% of its assessed values. While proposals of this nature might not have substantial effect upon a larger, wealthier, and more populous county, the effect is bound to be quite different upon a county that is not only small in size but also ranks 133rd out of 136 localities in local revenue capacity, suffers from above average fiscal stress in comparison with other localities, has lost 33.7% of its local ability to finance education, and falls well below the state average in wealth indicators of true value of real estate per capita, adjusted gross income per capita, and taxable sales per capita.

## CONCLUSION

In the approach they have taken before this Court, Hopewell and Petersburg suggest that we should treat this case as a replay of *Rockingham*, with a similar result—an award of annexation. No two situations, however, could be more dissimilar. *Rockingham* is a textbook example of a case in which annexation should be awarded; the evidence in this case simply does not meet the *Rockingham* standard. Accordingly, the order denying annexation will be affirmed.

*Affirmed.*